UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ESTATE OF KENNETH H. REISERER, )
REISERER & AGEE, LLP, by ESTATE OF )
KENNETH H. REISERER, its successor in )
interest, )
  )
    Petitioners, )
  )
    v. )
  )
UNITED STATES OF AMERICA, )
  )
    Respondent. )
_____)

CASE NO. C04-0967-JCC

REPORT AND RECOMMENDATIONS

Petitioners have moved to quash a third-party summons issued by the Internal Revenue Service to Bank of America. (Dkt. 1.) The Government responded by opposing the petition to quash and by moving for summary enforcement of the summons. (Dkt. 21.) The Court, having considered the papers submitted in support of and in opposition to the petition, and having heard oral argument by the parties, recommends that the petition to quash be DENIED and that the Government's motion for summary enforcement be GRANTED. The reasons for this recommendation are set forth below.

### FACTUAL BACKGROUND

The petition to quash was filed on April 28, 2004, by Kenneth Reiserer and Reiserer & Agee, LLP. However, Mr. Reiserer died on July 12, 2004. The estate of Mr. Reiserer has been substituted in this action for Mr. Reiserer pursuant to Fed. R. Civ. P. 25. (Dkt. 18.)

REPORT AND RECOMMENDATIONS
PAGE -1

01    Mr. Reiserer was an attorney licensed to practice in Washington and California.  His

02 practice included tax planning services.  Petitioners allege that Mr. Reiserer practiced as a solo

03 practitioner during various periods from 1980 through 1996 and after 1997.  Petitioners also allege

04 that Mr. Reiserer practiced as a partner with the law firm of Reiserer & Agee LLP during a period

05 in 1996 and 1997.  Petitioners state that the firm ceased operations in 1997 and that Mr. Reiserer

06 was the sole successor in interest to the assets and liabilities of the firm.

07    This matter concerns a summons issued by the Internal Revenue Service (IRS) to Bank of

08 America in April 2004.  The summons directed the bank to provide documents and records

09 relating to Mr. Reiserer, as well as documents and records relating to Reiserer & Agee and a

10 number of additional entities allegedly linked to Mr. Reiserer.[1]  Among other items, the summons

11 requested: (a) all documents and records of deposits, including all deposited items in amounts

12 greater than $1,999.99; (b) all cancelled checks, drafts, and all other documents used to order

13 payment from funds maintained in the accounts in amounts of more than $1,999.99; and (c) all

14 other documents and records which in any manner evidence the transfer of any funds or securities

15 into or out of the accounts in amounts greater than $1,999.99.  The summons seeks documents

16 and records from January 1, 1993 to April 7, 2004.

17    The Government alleges that Mr. Reiserer was involved with an abusive tax arrangement

18 known as an "offshore employee-leasing" (OEL) scheme.  The Government alleges that OELs are

19 often marketed to highly-paid professionals as a means of evading taxes through a complicated

20 series of steps involving domestic and foreign parties.  The Government further alleges that Mr.

21 Reiserer was an officer or director of several domestic leasing corporations involved in an OEL

22 scheme.  According to Revenue Agent Sue Ann Besson, Mr. Reiserer refused to provide the IRS

23

24

25    [1] The other entities named in the summons are Personnel Services Leasing, Inc.;
Nationwide Executive Staff Leasing, Inc.; International Leasing Services, Inc.; International
Management Concepts, Inc.; Focus, Inc.; Shoshana of Nevada, Inc.; and Texas ILS, Inc.  None
26 of these entities are named as petitioners in the motion to quash.

REPORT AND RECOMMENDATIONS
PAGE -2

01 with his customer list prior to his death. However, Ms. Besson states that her preliminary
02 investigation into this matter indicates that Mr. Reiserer marketed OELs to at least 21 customers.[2]
03 Of those 21 customers, Ms. Besson maintains that several have been found to have substantially
04 underreported income, ranging from $36,700 to $2,430,000 per year.

05 Although Mr. Reiserer died several months after the summons was issued, the Government
06 states that it is continuing the investigation for purposes of determining whether penalties under
07 sections 6700 or 6701 of the Internal Revenue Code (I.R.C.)[3] will be assessed against Mr.
08 Reiserer's estate. Sections 6700 and 6701 permit the Government to impose penalties for
09 promoting abusive tax shelters and for aiding in the preparation or presentation of documents that
10 result in an understatement of tax liability. The Government maintains that the summoned
11 documents would assist in establishing the number of Mr. Reiserer's customers who have used
12 OELs, in identifying actual and potential customers to whom Mr. Reiserer may have made false
13 statements during the course of promoting OELs, and in determining whether Mr. Reiserer
14 otherwise advised or assisted customers to violate the internal revenue laws in violation of section
15 6701. The Government maintains that this information is necessary because potential penalties
16 under the relevant statutes are based on the number of illegal schemes organized or sold and on
17 the number of documents prepared or presented that result in an understatement of tax liability.

## ANALYSIS

19 I.R.C. § 7602 provides the IRS with "wide latitude" to issue summons to obtain
20 information necessary for investigative purposes. *United States v. Jose*, 131 F.3d 1325, 1327 (9th
21 Cir. 1997). To obtain enforcement of a summons, "the IRS need only demonstrate 'good faith'

---

[2] Ms. Besson indicated that she learned of these customers through a variety of methods, including a review of "bank records produced by Wells Fargo in response to an investigative summons similar to the summons at issue in this case." (Dkt. 21, at 4-5.) Ms. Besson states that Mr. Reiserer "did not petition to quash the Wells Fargo summons." *Id.* at 5.

[3] The I.R.C. is codified at Title 26 of the United States Code.

REPORT AND RECOMMENDATIONS
PAGE -3

01 in issuing the summons." *Lidas, Inc. v. United States*, 238 F.3d 1076, 1081-82 (9th Cir. 2001). 02 In *United States v. Powell*, 379 U.S. 48 (1964), the Supreme Court set forth the standards that 03 the Government must satisfy in order to make a *prima facie* showing of good faith: (1) the 04 investigation will be conducted pursuant to a legitimate purpose; (2) the inquiry may be relevant 05 to the purpose; (3) the information sought is not already within the possession of the IRS 06 Commissioner; and (4) the administrative steps required by the Internal Revenue Code have been 07 followed. *Id.* at 57-58. "The government's burden is a slight one, and may be satisfied by a 08 declaration from the investigating agent that the *Powell* requirements have been met." *United* 09 *States v. Dynavac, Inc.*, 6 F.3d 1407, 1414 (9th Cir. 1993). Here, the Government makes its good-10 faith showing through the declaration of Revenue Agent Sue Besson (Dkt. 22), the agent who 11 issued the summons.

12 If the Government makes a *prima facie* showing of good faith, a taxpayer may challenge 13 a summons on any appropriate grounds, including failure to satisfy the *Powell* requirements or 14 abuse of the court's process. *Jose*, 131 F.3d at 1328. However, the burden is on the taxpayer to 15 rebut the presumption of good faith. *Lidas,* 238 F.3d at 1082. This burden is "a heavy one" and 16 the taxpayer "must allege specific facts and evidence to support his allegations." *Liberty Fin.* 17 *Servs. v. United States*, 778 F.2d 1390, 1392 (9th Cir. 1985).

18 In their opposition to the Government's motion for summary enforcement, petitioners do 19 not explicitly dispute that Revenue Agent Besson's declaration is sufficient to make a *prima facie* 20 showing of the Government's good faith in issuing the summons. However, petitioners raise 21 several arguments in opposition to enforcement of the summons, which are addressed below.

22    A.  <u>Survival of Action After Mr. Reiserer's Death</u>

23 Petitioners first argue that actions under I.R.C. §§ 6700 and 6701 against Mr. Reiserer's 24 estate may not pursued after Mr. Reiserer's death. As a result, they suggest that the 25 Government's request for enforcement of the summons should be denied as moot. Because there 26 does not appear to be any case law on whether penalties under sections 6700 or 6701 abate with

death, petitioners' argument presents a novel issue of law.

It is "a well-settled rule that actions upon penal statutes do not survive the death" of a party. *United States v. Oberlin*, 718 F.2d 894, 896 (9th Cir. 1983). Consistent with this rule, the Ninth Circuit has held that "an action only abates if the underlying statute upon which it is based is penal in nature." *United States v. $84,700 Currency*, 981 F.2d 1110, 1113 (9th Cir. 1992). Therefore, actions under sections 6700 and 6701 would not survive Mr. Reiserer's death if these statutes are determined to be penal in nature.

As noted earlier, section 6700 provides for the imposition of penalties against promoters of abusive tax shelters. Promoters may be assessed a penalty of $1,000 for each unlawful activity under this statute, although this penalty may be reduced if the promoter establishes that the gross income derived from the unlawful activity is less than $1,000. Section 6701 provides for the imposition of penalties against persons who aid, assist, or advise in the preparation or presentation of documents that result in the understatement of tax liability of another person. In general, persons who violate section 6701 may be subject to a penalty of $1,000 for each violation, although a penalty of $10,000 may be assessed in cases involving the understatement of a corporation's tax liability.

To determine whether these statutes are penal in nature, the Government suggests that the Court should apply a two-part test set forth in *Hudson v. United States*, 522 U.S. 93 (1997). This test is used to determine whether a particular punishment is considered criminal or civil for double jeopardy purposes.[4] Under this test, the court asks: (1) whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference of one label or the other; and (2) whether the statutory scheme is so punitive either in purpose or effect as to

---

[4] The Government also points to *Helvering v. Mitchell*, 303 U.S. 391 (1938). In *Mitchell*, the Court found that provisions of the I.R.C. that provided for the assessment of a 50% addition to a taxpayer's liability in cases of fraud were not penal in nature for the purposes of determining whether the double jeopardy clause is implicated. Like *Hudson*, *Mitchell* was a double jeopardy case and did not address the issue of whether an action survives the death of a defendant.

REPORT AND RECOMMENDATIONS
PAGE -5

transform what was clearly intended as a civil remedy into a criminal penalty. *Id.* at 99.

Petitioners suggest that the *Hudson* test is limited to double jeopardy cases and does not apply here. Instead, petitioners urge the Court to determine whether actions under sections 6700 and 6701 are penal in nature by reference to three factors identified in *Murphy v. Household Finance Corp.*, 560 F.2d 206 (6th Cir. 1977). The *Murphy* court stated that "[t]hree factors in particular deserve attention" in determining whether a statutory action is penal in nature: "1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; 2) whether recovery under the statute runs to the harmed individual or to the public; and 3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered."[5] *Id.* at 209. Although some courts have looked to the *Murphy* factors to determine whether a action in penal in nature, petitioners have not cited any cases involving tax penalties where a court applied the *Murphy* factors.[6] In addition, petitioners do not cite any Ninth Circuit decisions that have adopted or applied the *Murphy* factors.

Indeed, Ninth Circuit case law on the survival of actions following the death of a party appears to be sparse. The only Ninth Circuit decision cited by the parties on this issue is *Estate of Rau v. Commissioner*, 301 F.2d 51 (9th Cir. 1962). In *Rau*, the court held that an action to impose a 50% addition to a taxpayer's liability for fraud survived the death of the taxpayer. The court noted that several other circuits had held that such actions did not abate with death, and that those decisions were largely based on the reasoning of the U.S. Tax Court in *Reimer's Estate v. Commissioner*, 12 T.C. 913 (1949). In *Reimer*, the Tax Court found that such actions were

---

[5] In *Murphy*, the court was not addressing a situation where a party to an action had died. Instead, the court was seeking to determine whether an action by a bankrupt party against a lending company under the Truth in Lending Act passed to the trustee in bankruptcy pursuant to § 70a of the Bankruptcy Act. *Id.* at 206-07.

[6] Indeed, one of the cases that petitioners cite in support of their argument – *United States v. Edwards*, 667 F. Supp. 1204, 1213 (W.D. Tenn. 1987) – noted that the *Murphy* court did not discuss tax cases.

REPORT AND RECOMMENDATIONS
PAGE -6

01 remedial rather than penal in nature, noting that taxpayer fraud constitutes an injury to the
02 property of the United States because it serves to "deprive the sovereign of money it is entitled
03 to receive and obligated to collect" and "makes it necessary for the Government to expend other
04 public funds in order to uncover the fraud and collect the proper amount of the tax due." *Reimer*,
05 12 T.C. at 920-21. As such, the Tax Court found that such an action survived the death of the
06 taxpayer because the penalty was "not in the nature of punishment imposed for the commission
07 of an offense against the United States, but relates to the right of the sovereign to receive from
08 each individual taxpayer the full measure of the taxes owed, and it is designed solely to indemnify
09 the Government for the monetary loss and damage sustained by reason of its being deprived of its
10 revenue and the expense incurred incident to its collection." *Id.* at 921.

11 Petitioners suggest that this reasoning would not apply here. Petitioners argue that
12 penalties under sections 6700 and 6701 do not compensate the IRS "in any fashion for lost
13 revenue" and that "there is no correlation between the tax revenues lost and the amount of the
14 penalty." (Dkt. 26, at 6). However, there can be little doubt that persons who promote abusive
15 tax shelters or aid in the preparation of documents that understate tax liability contribute
16 significantly to the loss of tax revenue. Like the taxpayer fraud at issue in *Rau* and *Reimer*, such
17 conduct contributes to an injury to the property of the United States. In addition, the penalties
18 under sections 6700 and 6701 could be viewed as providing compensation to the Government for
19 expending resources to uncover tax fraud. As such, the reasoning in *Rau* and *Reimer* would not
20 appear to be inapposite here, even if the cases are not directly on point.

21 More recently, the court in *United States v. $84,740 Currency*, 981 F.2d 1110 (9th Cir.
22 1992), considered whether the Government could pursue a civil forfeiture action following the
23 death of the person who owned the currency subject to forfeiture. The court held that because
24 the relevant statute was "primarily civil in nature," the abatement doctrine did not apply and the
25 action survived the death of the currency owner. *Id.* at 1113. In its analysis, the court relied on
26

REPORT AND RECOMMENDATIONS
PAGE -7

the same two-part test discussed in *Hudson*.[7] *Id.* at 1113-14. This case suggests that the *Hudson* test may be used to assess whether a statute is penal in nature for the purposes of determining survivability of actions following the death of a party.

Therefore, it appears to be more appropriate to approach this issue by reference to the *Hudson* test, rather than by reference to the *Murphy* factors. As noted earlier, the *Hudson* test asks: (1) whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference of either a civil or criminal label; and (2) whether the statutory scheme is so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty. *Hudson*, 522 U.S. at 99.

First, it appears that in adopting sections 6700 and 6701, Congress expressed a preference to label the penalties as civil in nature. As the Government notes, Congress included these section in I.R.C. Chapter 68 ("Additions to the Tax, Additional Amounts, and Assessable Penalties"), rather than in Chapter 75 ("Crimes, Other Offenses, and Forfeitures").

Second, it does not appear that the penalties provided by sections 6700 and 6701 are so punitive in either purpose or effect that they may be regarded as criminal penalties. The Court in *Hudson* set forth several "guideposts" to be considered in making this determination, including: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment – retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *Hudson*, 522 U.S. at 99-100. The *Hudson* court also cautioned that "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.*

---

[7] This test had initially been employed in *United States v. Ward*, 448 U.S. 242 (1980).

01      Here, there is not clear proof that Congress intended sections 6700 and 6701 to be criminal
02 penalties.  The penalties under these sections do not involve an affirmative disability or restraint
03 and have not been historically regarded as punishment.  While the penalties may have a deterrent
04 effect on tax fraud, the penalties also serve the alternative remedial purpose of reimbursing the
05 Government for lost revenue and the expense of investigating fraud.  The penalties do not appear
06 to be excessive in relation to the Government's expenses and potential losses.  On balance, the
07 penalties do not appear to be significantly punitive in purpose or effect.

08      Finally, two other cases lend additional support to a finding that sections 6700 and 6701
09 are not penal in nature.  In *United States v. Noske*, 117 F.3d 1053, 1057 (8th Cir. 1997), the court
10 found that penalties under section 6700 were remedial rather than penal in nature for the purposes
11 of double jeopardy, noting that "the penalty serves the remedial goal of reimbursing the
12 Government."  Similarly, in *Lea v. United States*, 882 F. Supp. 687, 689 (W.D. Tenn. 1995), the
13 court held that penalties under section 6701 were "remedial in nature rather than punitive, serving
14 the purpose of compensating the United States for its losses."  This reasoning is akin to the
15 reasoning adopted by the *Rau* and *Reimer* courts.

16      Therefore, it does not appear that actions under sections 6700 or 6701 should be regarded
17 as penal in nature.  As a result, it appears that actions under these statutes do not abate with death
18 and may be pursued against Mr. Reiserer's estate.

19 B.    <u>Attorney-Client Privilege</u>

20      Petitioners next argue that the summons should be quashed or modified to the extent that
21 the bank's compliance with the summons would reveal the identity of Mr. Reiserer's clients and
22 information regarding client fee arrangements.  Petitioners argue that disclosure of such
23 information would violate the attorney-client privilege.  This argument must fail for several
24 reasons.

25      As the parties asserting attorney-client privilege, petitioners have the burden of establishing
26 that the privilege applies to the information in question.  *Tornay v. United States*, 840 F.2d 1424,

REPORT AND RECOMMENDATIONS
PAGE -9

1426 (9th Cir. 1988). Although the information sought by the summons will likely reveal the identities of a number of Mr. Reiserer's clients and how much the clients paid Mr. Reiserer, petitioners have not shown that this information is protected by the attorney-client privilege.

In general, the identity of a client is not subject to the attorney-client privilege, nor are fee arrangements between an attorney and a client. As the Ninth Circuit has observed:

> Information regarding the amount paid for legal services or the form of payment ordinarily does not disclose the subject matter of the professional consultation. Similarly, the identity of a client usually does not indicate the purpose for which legal advice was sought or reveal any subsequent confidential communications made during the course of the attorney-client relationship. Accordingly, the attorney-client privilege ordinarily protects neither a client's identity nor information regarding the fee arrangements reached with that client.

*United States v. Horn*, 976 F.2d 1314, 1317 (9th Cir. 1992)

Petitioners largely based their attorney-client privilege assertion on *Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960). In *Baird*, an attorney had made a payment to the IRS on behalf of unidentified taxpayers, after consulting with the taxpayers' accountants and other attorneys. *Id.* at 626. The attorney sent this payment to the IRS with a letter stating that the payment "represents additional amounts due from one or more taxpayers for some past years. Their names have not been disclosed to me. However, I am informed that the aggregate additional amount, together with interest . . . is the amount of the check . . . ." *Id.* In essence, the attorney in *Baird* was forwarding a payment to the IRS for tax liabilities that his unidentified clients had unlawfully failed to pay, an action that acknowledged the guilt of his clients. The IRS then issued a summons to require the attorney to identify the attorneys, accountants, and taxpayers for whom the check had been forwarded. *Id.* at 627. The attorney declined to do so, citing attorney-client privilege. *Id.* Under these unusual circumstances, the court held that the attorney-client privilege protected the attorney from disclosing the names of his clients.

*Baird* stands for the proposition that "the identity of a client is privileged information if revelation of that identity would constitute an acknowledgment of guilt of the offense that led the client to seek legal assistance." *Horn*, 976 F.2d at 1317. The Ninth Circuit has cautioned that

REPORT AND RECOMMENDATIONS
PAGE -10

01 "the *Baird* exception is an extremely narrow one" and that "[o]therwise unprotected information
02 does not become privileged merely because that information might provide evidence of a client's
03 wrongdoing." *Id.*; *see also United States v. Blackman*, 72 F.3d 1418, 1425 (9th Cir. 1995) ("We
04 have repeatedly held that the attorney-client privilege does *not* apply where disclosure might
05 incriminate the client or fee-payer, but *only* where it would convey information tantamount to a
06 confidential communication.") (emphasis in original).

07 Petitioners have not shown how this case would fall within the "extremely narrow" *Baird*
08 exception. They show how revealing the identity of any of Mr. Reiserer's clients would constitute
09 an acknowledgment of guilt of an offense that led the client to seek legal assistance from him. In
10 addition, petitioners do not address how the attorney-client privilege would apply here in light of
11 the fact that the Government is seeking records and documents from Mr. Reiserer's bank. The
12 Ninth Circuit has held that:

> [W]e know of no authority which recognizes a privilege for communications between bank and depositor . . . . The reasons which led to the attorney-client privilege, such as the aim of encouraging full disclosure in order to enable proper representation, do not exist in the case of a bank and its depositor. Moreover, the client, by writing the check which the attorney will later cash or deposit at the bank, has set the check afloat on a sea of strangers. The client knows when delivering the check, and the attorney knows when cashing or depositing it, that the check will be viewed by various employees at the bank where it is cashed or deposited, at the clearing house through which it must pass, and at this own bank to which it will eventually return. Thus, the check is not a confidential communication, as is the consultation between attorney and client.

19 *Harris v. United States*, 413 F.2d 316, 319-20 (9th Cir. 1969). As a result, petitioners' argument
20 that the summons should be quashed or modified on attorney-client privilege grounds is not well-
21 founded.

22 C.    Relevance

23 Petitioners also argue that the summons should be quashed or modified because the
24 identity of Mr. Reiserer's clients would be irrelevant to the Government's investigation of
25 petitioners' potential liability under sections 6700 and 6701. Petitioners argue that "[w]hat the
26 government is asking for here, without any showing of relevance, is tantamount to an unfettered

REPORT AND RECOMMENDATIONS
PAGE -11

fishing expedition through the client list of an attorney, known as a tax planning specialist." [8] (Dkt.28, at 10.)

The relevance standards for an IRS summons are not high. Congress has authorized the IRS to issue summons for information "which *may* be relevant or material" to an inquiry. I.R.C. § 7602(a)(1) (emphasis added). As a result, "an IRS summons is not to be judged by the relevance standards used in deciding whether to admit evidence in federal court." *United States v. Arthur Young & Co.*, 465 U.S. 805, 814 (1984). Instead, I.R.C. § 7602 allows the IRS "to obtain items of even *potential* relevance to an ongoing investigation, without reference to its admissibility." *Id.* (emphasis in original). The IRS "should not be required to establish that the documents it seeks are actually relevant in any technical, evidentiary sense." *Id.* Furthermore, "the IRS is not engaged in a 'fishing expedition' when it seeks information relevant to a legitimate investigation of a particular taxpayer. In such cases, any incidental effect on the privacy rights of unnamed taxpayers is justified by the IRS's interest in enforcing the tax laws." *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 321 (1985); *see also United States v. Luther*, 481 F.2d 429, 432 (1973) (noting that "the answer to the claim that the Government is engaged in a fishing expedition is without merit. Section 7602 authorizes the Secretary or his delegate 'to fish.'").

Here, the Government maintains that the identity of Mr. Reiserer's actual and potential clients is relevant to its investigation. In its motion for summary enforcement, the Government asserts:

---

[8] In their initial petition to quash, petitioners also alleged that "true purpose" of the summons is to obtain the identity of Mr. Reiserer's clients in order to initiate audits of those clients. *(*Dkt. 1, at 6.f). Petitioners asserted that the proper means by which the Government must obtain such information about the identity of petitioners' clients would be through a John Doe proceeding under I.R.C. § 7609(f). The Government has not stated that a purpose of the summons is to determine whether to audit Mr. Reiserer's clients. However, "even where the IRS admits it has a 'dual motive' – that is, that its investigation is aimed at unnamed as well as named persons – a John Doe summons is not required, so long as the trial court determines as a matter of fact that the IRS's investigation of the named party is legitimate." *United States v. Blackman*, 72 F.3d 1418, 1422 (9th Cir. 1995).

REPORT AND RECOMMENDATIONS
PAGE -12

> The information sought is necessary to the penalty investigation because penalty amounts are based on the number of illegal schemes organized or sold (I.R.C. § 6700) and the advice given pertaining to preparing documents resulting in an understatement (I.R.C. § 6701). The summoned documents will assist in establishing the potential number of Reiserer's customers that have used his OEL scheme. They will also assist in locating necessary witness testimony to establish other elements of proof required for I.R.C. §§ 6700 and 6701 penalty assessments.
>
> Identifying customers will also help the IRS obtain Reiserer's promotional materials from customers. These materials may contain false statements subject to penalty under I.R.C. § 6700. Interviewing Reiserer's customers may also disclose false statements Reiserer made in the promotion of his OEL scheme, as well as further illuminate the mechanics of the scheme. Such interviews may also disclose whether Reiserer otherwise advised or assisted customers to violate the internal revenue laws, in violation of I.R.C. § 6701.

Dkt. 21, at 7; *see also id.* at 11 (asserting that the Government "needs to acquire information regarding Reiserer's potential and actual customers, in part to determine false statements Reiserer made during the course of the promotion").

Petitioners have not offered a persuasive response to the Government's specific arguments.[9] In essence, petitioners maintain that client identities should be withheld because "some portion of the individuals which would be disclosed and identified if this summons were enforced do not appear to have any involvement in international employee leasing arrangements." (Dkt. 26, at 9). Petitioners base this argument on a review by their counsel of Mr. Reiserer's client billing records and his deposits of $2,000 or more to Bank of America over a two-month period in the summer of 2002.

However, this evidence is not sufficient to show that client identities may not be relevant to the Government's investigation. As the Supreme Court has noted, "the [IRS] can hardly be expected to know whether such data will in fact be relevant until they are procured and

---

[9] Petitioners cite *Tedder & Associates Inc. v. United States*, 77 F.3d 1166 (9th Cir. 1996), a case in which the Ninth Circuit held that bank records revealing the identity of a law firm's clients were not relevant for the purposes of enforcing an IRS summons. However, there was no showing in *Tedder* that the identities of the law firm's clients would be of any use to the IRS in its audit of the law firm. Here, by contrast, the Government argues that ascertaining client identities may be relevant to its investigation of petitioners' potential liability under Sections 6700 or 6701.

REPORT AND RECOMMENDATIONS
PAGE -13

scrutinized." *United States v. Arthur Young & Co.*, 465 U.S. 805, 814 (1984). Here, the Government has shown that Mr. Reiserer was involved in promoting an OEL arrangement, which creates a reasonable basis to believe that he marketed OELs to his customers in violation of section 6700. The Government cannot determine which of his customers were marketed OELs without identifying and interviewing his customers. It appears to be undisputed that the summoned bank records may allow the Government to identify Mr. Reiserer's customers. As such, the Government has made a sufficient showing that the records sought "may be relevant or material" to its investigation.

## CONCLUSION

For the foregoing reasons, it is recommended that the petition to quash be DENIED and that the Government's motion for summary enforcement be GRANTED. A proposed Order accompanies this Report and Recommendation.

DATED this  3rd  day of February, 2005.

s/ Mary Alice Theiler
United States Magistrate Judge